Edward R. Godfrey and Georgia G. Godfrey v. Commissioner.
Godfrey v. Commissioner
Docket No. 87061.
United States Tax Court
T.C. Memo 1963-1; 1963 Tax Ct. Memo LEXIS 343; 22 T.C.M. (CCH) 1; T.C.M. (RIA) 63001; January 2, 1963
*343 1. Held, that losses which the principal petitioner incurred for all the taxable years in attempting to build up a herd of cattle by the natural increase process, with the hope that the herd would eventually attain sufficient size to produce profit, are not deductible as losses incurred in a "business," under section 165(c)(1) of the 1954 Code. 2. Held, that none of the various expenditures which the principal petitioner made in connection with two Florida real estate projects is deductible as nonbusiness expenses under section 212(2) of the 1954 Code. Commissioner's determinations as to classification of items, sustained. Paul J. Buckley, Esq., Third National Bank Bldg., Dayton, Ohio, for the petitioners. Conley G. Wilkerson, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The Commissioner determined deficiencies in the income taxes of petitioners for years and in amounts as follows: Year
Deficiency
1955
$16,588.59
1956
14,952.80
1957
18,917.57
The issues for decision are: 1. Whether losses which the principal petitioner incurred for all the taxable years in attempting to build up a herd of catrie by the natural increase process, with the hope that *344 the herd would eventually attain sufficient size to produce profits, are deductible as losses incurred in a "business," under section 165(c)(1) of the 1954 Code. 2. Whether various expenses incurred by the principal petitioner in connection with two Florida real estate projects are deductible as nonbusiness expenses under section 212(2) of the 1954 Code. Some of the facts were stipulated and are so found. Separate findings of fact and a separate opinion as to each of the above issues are hereinafter set forth. Issue I. Findings of Fact Petitioners, Edward R. and Georgia G. Godfrey, are husband and wife. For each of the taxable years involved, they filed a joint Federal income tax return with the [*] director of internal revenue at [*] Ohio. The term "petitioner," as used hereinafter in the singular, will have reference to Edward R. Godfrey. Petitioner, during the greater part of his adult life. has been an employee [*] of General Motors Corporation. He was first employed by said corporation in about 1918 as a plant superintendent at Anderson, Indiana. In 1943, he was transferred to Dayton, Ohio, where he assumed the position of factory manager for the corporation's Frigidaire Division, *345 and where he subsequently was advanced to the position of general manager of that division. In 1948 he was transferred to the central office of General Motors at Detroit, Michigan, as a vice president and member of that corporation's board of directors; and he remained in Detroit and continued to be employed in such capacities until his retirement on June 1, 1955. For several years prior to 1943, both petitioner and his wife had desired to live on a farm; and upon his transfer to Dayton in 1943, petitioner satisfied this desire by purchasing a farm in Warren County, Ohio, which was located about 17 miles from Dayton. He and his wife resided on this farm from the date of its purchase until 1948, when petitioner was transferred to Detroit. While in Detroit petitioner and his wife lived in a apartment hotel; however, they were able to spend 3 out of 4 weekends per month at the farm. After his retirement on June 1, 1955, and including the years here involved, petitioner and his wife renewed their residence on the farm. Petitioner paid a total purchase price of $38,000 for the farm and various chattels thereon, which included 109.27 acres of land, a farm residence together with various *346 farm buildings, a small herd of Jersey cattle, and miscellaneous farm machinery and equipment. He allocated said purchase price as follows: $9,250 to the farm residence; and $28,750 to the land, the Jersey cattle, and the miscellaneous farm buildings, machinery, and equipment. Thereafter from the time of purchase through the years involved, he expended $63,447.85 in improving the residence, and a total of $79,436.01 in improving the farm and in purchasing additional farm machinery and equipment. During the years involved, the residence had 12 rooms, and there was also a guest house which had 3 rooms. He and his wife alone occupied the residence, and did no extensive entertaining. The farm was not equipped with recreational facilities. In 1950, which was prior to the years involved, petitioner disposed of all the abovementioned Jersey cattle; and in 1951, he purchased an adjacent tract of 27 acres of land, together with the improvements thereon, for $21,000. Petitioner, at the time he purchased the farm in 1943 was aware of his meager knowledge of farm operations. He thereupon subscribed to various farm magazines, contacted the Agriculture Department's local county agent, and had samples *347 of the soil tested. He then decided in late 1945, after discussiong the matter with some of his friends who were cattle raisers, that the breeding, raising, and selling of cattle would constitute the best use of his farm; and the particular breed that he decided to raise was the polled Hereford. Petitioner estimated that a 100-animal herd would be the minimum size required for even a possibility of making a profit; and although he was financially able to have purchased a breeding herd of such requisite size to start with, he was unwilling to do so. Rather, he initially bought at a total cost of $2,785 only 8 cows and 1 bull, with the avowed intention of building up a herd of said 100 animals by the natural increase that he hoped would occur through breeding the cows. Thereafter, in 1947, petitioner again concluded that with a herd of 100 animals, he should be able to realize a small profit from his cattle-raising activities. He anticipated that accumulating such a herd through the natural increase method would require from 10 to 12 years; or to state it another way, that it would be 1957 or 1959 before his herd reached the minimum size of 100 animals from which he could hope to obtain *348 a profit. In 1957 (the last taxable year here involved) petitioner made a revised estimate, and concluded that it would be 1961 or 1962 before he could even hope to place his cattle operation on a profitable basis with a herd of 100 animals. He further estimated that even with such herd of 100 animals, he would, in order to make a profit, have to have a calf yield of 65 per year; sell 60 animals out of the herd each year at an average price of $400 per animal; and hold his operating expenses to about $20,000 per year. He never attained any of these estimated goals. Petitioner did not have sufficient acreage to accommodate a herd of 100 animals; and although he was able to raise enough feed for a smaller herd, he would have had to rent additional pastures, buy additional grain and incur additional expenses in order to maintain 100 animals. During the years 1946 through 1958 (which includes the taxable years 1955 through 1957 here involved), petitioner's herd of cattle increased in size, as shown in the following table: Number in
Butchered
herd at
for peti-
beginning
tioner's
Year
of year
Raised
Purchased
Sold
Died
use *
1946
1
9
1947
10
6
4
1948
12
6
1
1
1949
18
7
3
1
1950
21
8
4
2
1951
23
10
8
1
1952
24
14
2
3
1953
37
18
11
1
1954
43
21
25
1
1955
38
19
1
1
1
1956
54
20
1
13
3
1
1957
58
28
24
1
1
1958
60
*349 In January 1959, petitioner sold his entire herd, which at that time consisted of 54 animals, for a total consideration of $12,600, or an average price of $233.33 per animal, which was substantially less than his estimated selling price of $400 per animal. Later, in January 1960, petitioner sold the farm, including all the land, the residence and various farm buildings, and all the equipment, for a total consideration of $210,000. He did this because, at that time, he needed money for use in a Florida real estate venture which is hereinafter discussed in Issue II. During the years here involved, petitioner was a member of the Polled Hereford Association; and some of his better quality animals were registered with that association. However, he never advertised any of his animals for sale, nor did he ever exhibit them. During the years involved, petitioner hired a farm employee; and also from time to time, he hired casual help to do various chores required in running the farm. Petitioner himself, while employed in Detroit from 1948 through June 1, 1955, spent an average *350 of 3 out of 4 weekends per month on the farm - except for a period of approximately 7 months in 1954-1955, when he was on an extended business trip. On the weekends spent at the farm, he devoted 20 to 25 percent of his time to farm activities. Following his retirement in June 1955, he devoted some of his time to the farm, and some to his hereinafter described Florida real estate activities. In the joint income tax returns which petitioner and his wife filed for the years here involved, they reported adjusted gross incomes as follows: $329,993.05 for 1955; $274,468.08 for 1956; and $237,039.48 for 1957. In computing said adjusted gross incomes, they deducted as business losses incurred in the operation of their farm, the amounts of $15,968.12, $14,406.68 and $16,945.07, respectively, which they determined as follows: 1955
1956
1957
Farm Income
Cattle sold
$ 420.93
$ 1,873.56
$ 2,506.04
Corn
1,043.40
Hay
15.00
139.77
240.55
Waynesville Farmers Exchange
.50
.40
.60
Total Farm Income
$ 1,479.83
$ 2,013.73
$ 2,747.19
Farm Expenses
Labor
$ 3,674.12
$ 3,932.35
$ 3,422.24
Feed and seed
1,024.03
1,407.53
1,597.52
Truck and tractor expense
276.09
20.75
Supplies
278.07
258.36
204.74
Repairs and maintenance
2,072.95
2,246.60
5,369.14
Fertilizer and lime
2,432.51
( 14.40)
1,377.70
Veterinary fees
150.00
223.50
Gasoline, etc.
529.02
435.49
440.92
Taxes
685.60
595.75
540.70
Insurance
559.01
635.47
467.01
Tenant expense
1,126.01
1,137.20
971.07
Farm Expenses - continued
Automobile upkeep
$ 100.00
$ 250.00
Miscellaneous
$ 281.92
372.05
543.83
Depreciation
4,358.62
5,069.76
4,507.39
Total Farm Expense
$17,447.95
$16,420.41
$19,692.26
Net Loss
($15,968.12)
($14,406.68)
($16,945.07)
None of the above expenses pertained to the operation or maintenance of the farm residence.
*351 A summary of petitioner's income, expenses, and net losses in respect of his cattleraising activities for the taxable years 1952 through 1957, is as follows: Taxable
Farm
Farm
Net
years
income
expenses
losses
1952
$ 1,514.24
$ 14,805.94
$ 13,291.70
1953
1,659.43
24,135.81
22,476.38
1954
1,426.87
21,797.18
20,370.31
1955
1,479.83
17,451.95
15,972.12
1956
2,013.73
16,420.41
14,406.68
1957
2,747.19
19,692.20
16,945.01
Totals
$10,841.29
$114,303.49
$103,462.20
Note: The above stipulated net losses for 1955 and 1957 vary slightly from those claimed on the returns. The Commissioner, in his notice of deficiency herein, determined that none of the above-stated farm losses was deductible under the provisions of section 165 of the 1954 Code; but he did allow, under other provisions of the Code, deductions for the amounts of the real estate taxes shown in the above schedule. Ultimate Finding of Fact Petitioner was not, during any of the taxable years involved, engaged in a "business" of breeding, raising, and selling cattle. Opinion The basic question presented under this first issue is whether petitioner's cattleraising activities during the taxable years here involved, constituted the carrying on by him of a "business." Such *352 question is primarily factual. The ultimate finding of fact which we have hereinabove made, answers and disposes of this question in the negative, adversely to petitioner's contentions. Before a taxpayer can be said to be engaged in a business, we believe that at least two conditions must be met: (1) He must have a motive and intention of realizing a profit; and (2) his activities must be of that type or character which will constitute the present carrying on of a business, rather than those of preparing to enter and carry on a business at some future time. With respect to the necessity of a profit motive, we said in Henry P. White, 23 T.C. 90, 93-94, affd. (C.A. 6) 227 F. 2d 779, certiorari denied 351 U.S. 939: Whether the amounts presently in controversy are claimed as "losses" or as ordinary and necessary business expenses, the existence of a profit motive on the part of petitioner is requisite. [1] *360 The principle which we are now required to apply has been aptly stated by Judge Learned Hand sitting as a District Judge in Thacher v. Lowe, (S.C., N.Y.), 288 F. 994, 995: It does seem to me that if a man does not expect to make any gain or profit * * * it cannot be said to be a business *353 for profit, and while I should be the last to say that the making of a profit was not in itself a pleasure, I hope I should also be one of those to agree there were other pleasures than making a profit. * * * it does make a difference whether the occupation which gives him pleasure can honestly be said to be carried on for profit. Unless you can find that element it is not within the statute, * * * [Footnote omitted.] One clear and unmistakable conclusion that arises from the record in the instant case is that petitioner could not, and was fully aware that he could not, conceivably realize a profit from the cattle-raising activities in which he engaged during any of the taxable years. Nor could he even have had an expectation of a profit for at least 4 years after the last of the taxable years here involved; for according to his own testimony herein, it would have been 1961 at the earliest, before he could hope to accumulate a herd of 100 animals - the minimum size herd required for even a possibility of his making a profit. And even then, it was by no means certain that his projected activities would yield a profit; for he testified that, in order to make a profit, he would have had *354 to get "an average of about $400 apiece" from the sale of 60 animals per year, and also would have to hold his expenses to "a little over $20,000" per year. Since the average price per animal which petitioner realized on the sale of his entire herd of 54 animals in January 1959 was only $233.33, it would seem, to say the least, that his expectations were overly optimistic. Furthermore, it would appear that his estimate of only $20,000 expenses for a herd of 100 animals was a gross understatement, since he incurred $19,692.20 expenses in 1957 with a herd of only 58 to 60 animals, and in 1953 he incurred expenses of over $24,000 with a herd of only 37 to 43 animals. In our view, the most that can be said of petitioner's cattle-raising activities during the taxable years involved (as well as all prior years) is that he was endeavoring to build up a herd of animals that he hoped would eventually enable him to engage in a cattle business that might prove profitable at some future time. The expenses incurred in building up his herd were, accordingly, in preparation for his future entry into a cattleraising business for proeit; and such being the case, it can not be said that at the time *355 the expenses here involved were incurred, petitioner was already in the cattle-raising business. See in this connection, George C. Westervelt, 8 T.C. 1248, wherein we disallowed certain expenses of a taxpayer (who was actually in the shipyard construction business, but who also was interested in getting into the cattle-raising business), that were incurred in traveling about the country collecting data, investigating cattle-raising methods, and acquiring bulls for a foundation herd. Further, see Robert J. Wallendal, 31 T.C. 1249, 1251, and the cases there cited, wherein we held that expenses of preparing to enter a business do not qualify for deduction as the ordinary and necessary expenses of carrying on a business. Moreover, it is significant that here we have a man of large income and demonstrated business ability buying a farm located a short distance from his place of employment; who expended a total of nearly $181,000 in acquiring and improving this farm, including expenditures of over $63,000 in improving the farm residence alone; but who was unwilling to invest more than about $2,800 for cattle with which to start a purported cattle-raising business that he knew could not *356 possibly yield him any profit for at least 10 or 12 years in the future. And even then, if such cattle-raising activity should prove profitable, it is obvious that it would require many additional profitable years to recoup his losses, to say nothing of a reasonable return on his sizeable farm investment. This situation is clearly distinguishable from that of an individual who starts a small business with a view to realizing profits with which to build a larger business. We believe from our consideration of the evidence, that petitioner's primary purpose in buying and developing the farm as a whole, was not to establish a business with which to augment his already large income, but rather to gratify his desire to establish a substantial country estate. After considering and weighing all the evidence, we hold in accordance with our ultimate finding of fact, that petitioner was not engaged during any of the taxable years here involved, in raising cattle as a "business," and that the losses involved are not deductible as business losses under section 165(c)(1) of the 1954 Code. Issue II. Findings of Fact Petitioner, together with four other persons, contracted in 1955 to purchase 50 *357 acres of land located in the city of St. Petersburg, Florida, known as the "Goose Pond" property. Prior to their actual purchase of said property, petitioner and his associates caused a "use survey" to be conducted for the purpose of determining the best commercial use of the property. From this survey, they concluded that the upper portion of said 50-acre tract could best be used for an automobile dealership, and that the lower portion could best be used for a shopping center. In the latter part of 1955, the purchase was consummated under an arrangement whereby title to the property was transferred to and was thereafter held by a corporate trustee, with the actual management of the property being handled by the petitioner and his associates. The Goose Pond property, at the time it was acquired, did not have a zoning classification which would permit it to be used in the manner that the use survey indicated would be its best use. Consequently, petitioner and his associates thereupon decided to attempt to have the property rezoned. Their application for rezoning was approved initially by the St. Petersburg Zoning Commission; but when the application was thereafter submitted to the St. *358 Petersburg City Council, difficulty was encountered. Petitioner and his associates then retained a local firm to represent them before said city council; but the final result was that their application was rejected. Thereafter, petitioner and his associates decided to sell the property in parcels. Some of the property was disposed of in each of the taxable years 1956 and 1957. Petitioner, during the taxable year 1955, expended $180.34 as his proportionate share of the fee paid to the corporate trustee at the time it took title to the Goose Pond property; he expended $1,666.66 as his proportionate share of the cost of the abovementioned "use survey" made with respect to said property; and $560.70 for travel and living expenses in connection with his above transactions relating to this property. In 1956, petitioner paid $2,394.77 as his proportionate share of the legal fees incurred in the unsuccessful attempt to secure the rezoning of said property; and also $1,398.19 as travel and living expenses in connection with conferences held with his associates and broker, regarding arrangements for the disposition of portions of said Goose Pond property. In 1957, petitioner expended $241.18 *359 for various unidentified "miscellaneous administrative expenses," and $1,758 for travel and living expenses - all of which he claimed were in connection with said property. The petitioner, in the income tax returns which he and his wife filed for the taxable years 1955, 1956, and 1957, claimed deductions for all of the above-mentioned items as nonbusiness expenditures under section 212(2) of the 1954 Code. [1] The Commissioner however, in his notice of deficiency herein, disallowed all the above claimed deductions. As to the items sought to be deducted for the years 1955 and 1956, the Commissioner determined that all of these represented capital expenditures; and as regards the aggregate amount of $1,999.18 sought to be deducted for the year 1957, he determined that $1,288 thereof (including $1,046.82 travel expenses and $241.18 miscellaneous expenses) represented capital expenditures, and the balance of $711.18 represented nondeductible personal expenses. In 1957 petitioner, together with four other persons, entered into another Florida venture, which involved their purchase for a price of $1,000,000 of a large tract of 14,000 acres located near Ocala, Florida, and known as the "Adams Packing" property. Title to this property was transferred to and was thereafter held by a corporate trustee, under an arrangement whereby petitioner and his associates retained the management of the property. Petitioner, during the taxable year 1957, paid $372.96 for travel and living expenses in connection with the acquisition of his interest in this property, and in connection with inspecting the property and conferring with his associates as to its use. Also in 1957, he paid $200 as his proportionate share of the corporate trustee's fee, and $688.24 as his proportionate share of real estate taxes and insurance relating to the property. As to these two latter items, the record is silent as to whether or not they were charges against the property at the time of its acquisition. Petitioner, in the income tax return of him and his wife for the year 1957, claimed deductions for all of the *361 above-mentioned expenditures related to the Adams Packing property, as nonbusiness expenses under section 212(2). The Commissioner however, in his notice of deficiency for said year, disallowed all of said claimed deductions, and determined that the same represented capital expenditures. Opinion The question presented under this issue is how the various expenditures here involved should be classified and treated for income tax purposes. Some of these expenditures relate to petitioner's Goose Pond property venture, and others relate to his Adams Packing property venture. Petitioner contends that all these expenditures are deductible as nonbusiness expenses under section 212(2) of the 1954 Code. [2] We do not agree with such contention. (A) Expenditures for "use survey" ro Goose Pond property. The purpose of the "use survey" conducted in 1955 for the Goose Pond property was to aid petitioner and *362 his associates to determine the best use for this property which they had contracted to buy, but as to which they had not yet taken title. It represented their first step in the contemplated development of the property; and its benefits were obviously expected to extend beyond the year in which the survey was made. Such a survey is similar to that of a geophysical survey, the cost of which has been held to be a capital expenditure. Louisiana Land & Exploration Co., 7 T.C. 507, affirmed on another issue 161 F. 2d 842 (C.A. 5, 1947). We conclude and hold that the cost of the present survey, likewise, was a capital expenditure as determined by the Commissioner; and hence that it is not deductible as a nonbusiness expense. (B) Legal expenditure in attempting to rezone Goose Pond property. This expenditure represents petitioner's proportionate share of an amount paid by him and his associates in 1957, in an unsuccessful attempt to have the Goose Pond property rezoned for certain commercial use. Such expense, like the above-mentioned "use survey" expense, was therefore part of the cost of the development of the capital asset, and was of a capital nature. Louisiana Land & Exploration Co., supra. *363 See also Arthur T. Galt, 19 T.C. 892, 910, affirmed on other grounds in 216 F. 2d 41 (C.A. 7), involving an attorney's fee paid in rezoning property. Petitioner has conceded, on brief, that if the rezoning attempt had been successful, the legal expense involved would represent a capital expenditure; but he contends that because the attempt was unsuccessful, such expenses should be allowed as a deductible nonbusiness expense. We do not agree. In Parkersburg Iron & Steel Co. v. Burnet, 48 F. 2d 163, affirming 17 B.T.A. 74, the Court of Appeals for the Fourth Circuit said: [Whether] or not a given outlay actually results in ultimate advantage to the taxpayer does not determine whether such outlay is to be treated as representing permanent improvement; that is, a capital expenditure, * * * The true test is rather the nature of the expenditure in and of itself for * * * an alteration may be made expressly for the purpose of increasing the value of a given property; and though it may fail to accomplish that purpose, it nevertheless may remain a capital expenditure. * * * ultimate advantage or disadvantage to the taxpayer is not the criterion. We hold that the fee in question is not deductible *364 as a nonbusiness expense. (C) Trustees' fees re both Goose Pond property and Adams Packing property. As we have hereinabove found, petitioner paid $180.34 in 1955, as his proportionate part of the trustee's fee in respect of the Goose Pond property; and in 1957, he paid $200 as his share of the trustee's fee in respect of the Adams Packing property. Since each of these trustees' fees was paid in the respective year that the title was acquired and placed in trust, it is reasonable to assume (as respondent has contended) that the amounts paid were incident to the creation of the trusts and the trustees' acceptance of the titles, and hence that they were part of the costs of acquiring the properties. There is no evidence to the contrary. The cost of acquiring a capital asset is a capital expenditure. Herbert Shainberg, 33 T.C. 241, 251. Furthermore, the provisions of section 212(2) pertaining to expenses incurred in "the management, conservation or maintenance of property held for the production of income," are not applicable to capital expenditures; and such expenses are not deductible under said section. Income Tax Regs., section 1.212-1(n). We hold that the trustees' fees involved *365 are not deductible by petitioner as nonbusiness expenses. (D) Travel and living expenses - Goose Pond property and Adams Packing property. Petitioner expended $560.70 in 1955 and $1,398.19 in 1956 for travel and living expenses in connection with the Goose Pond property; and in 1957, he expended $1,758 for travel and living expenses, which he contends were also in connection with said property. He further contends that all these items are deductible as nonbusiness expenses. The Commissioner however, in his notice of deficiency, disallowed deductions for all these items. He determined that the amounts so expended in 1955 and 1956 were capital expenditures; and that $1,046.82 of the amount expended in 1957 was likewise a capital expenditure. And the balance of $711.18 expended in 1957 was (as petitioner has agreed on brief) disallowed as being personal expenses. Petitioner's testimony herein establishes that the 1955 travel and living expenses were incurred in connection with the purchase of the Goose Pond property, conferences with his associates regarding arrangements for the above-mentioned "use survey," and decisions as to how the property should be used. Thus, these expenses were *366 not incurred for the management, conservation or maintenance of the property. Rather, they related to the acquisition and development of the property; and they therefore constituted capital expenditures, as the Commissioner determined. See Herbert Shainberg, supra.
The 1956 travel and living expenses were incurred, as petitioner testified, on trips made for the purposes of conferring with his associates and a broker in connection with disposal of portions of the Goose Pond property. Thus such expenses represent selling expenses that were not incurred in a business of selling real estate; and they should be treated as an offset against the selling price of the property in computing the resulting capital gain therefrom. [3]South Texas Properties Co., 16 T.C. 1003. We think that the Commissioner properly determined that the same are not deductible as nonbusiness expenses. As regards the 1957 travel and living expenses claimed to have been incurred in connection with the Goose Pond property, the Commissioner *367 determined as we have above stated, that $1,046.82 of the same represented capital expenses. The evidence establishes that these were of the same character as the 1956 travel and living expenses which we have dealt with above; and accordingly we hold that they, likewise, are not deductible. The balance of petitioner's travel and living expenses for 1957 was determined by the Commissioner to be nondeductible personal expenses; and there is no evidence which tends to establish error in that determination. Finally, petitioner expended $372.96 in 1957 for travel and living expenses in connection with the Adams Packing property. These, like the similar expenses which petitioner incurred in 1955 with respect to the Goose Pond property, were for trips to confer with his associates regarding the purchase of the property and the manner in which it was to be used. In accordance with our conclusion as to said 1955 expenses, we hold that the present item represents a capital expenditure incident to the acquisition of the Adams Packing property. (E) Miscellaneous expenses. For the year 1957, petitioner claims deductions for the following miscellaneous items, as nonbusiness expenses under section 212(2): *368 $241.18 for "miscellaneous expenses" relating to the Goose Pond property; and $688.24 for insurance and realty taxes relating to the Adams Packing property. The Commissioner, in his notice of deficiency, determined that both of these items represented capital expenditures, and disallowed deduction for the same as nonbusiness expenses. As regards the first of these items, the record is devoid of any facts or explanation regarding the nature of the same or its relation to the Goose Pond property; but merely shows that it was deducted. As to the insurance and taxes, the record also does not establish any facts regarding the same, except that the expenditures therefore were made in the year when the Adams Packing property was acquired. As respondent has pointed out on brief, payments for real estate taxes covering periods prior to the time when a purchaser acquired title to the property, and which had theretofore become a lien on such property, are, when paid by the purchaser, regarded as part of the purchase price of the property. Milton L. Grahm [Dec. 21, 744], 26 T.C. 315, 317. The same is true of payments made by a purchaser for insurance covering periods prior to the time when he *369 acquired title. In the absence of any evidence herein regarding the above-mentioned payments, we are impelled to conclude that the petitioner has failed to carry his burden of establishing error in the Commissioner's determination that both items represented capital expenditures, and hence were not deductible as nonbusiness expenses under section 212(2). We sustain the Commissioner's determinations as to all expenditures involved in Issue II. Decision will be entered for the respondent. Footnotes
*. Amounts estimated to be the value of the animals butchered for personal use were treated by petitioner as farm income.↩
1. In addition to the above items, petitioner also claimed deductions for various other expenditures alleged to have been made in connection with the Goose Pond property: but he has since conceded that all of these additional items are not deductible. Accordingly, none of the same is here in issue.
2. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a dedurtion all the ordinary and necessary expenses paid or incurred during the taxable year - * * *
[*] for the management conservation or [*] of the property held for the production of income…↩
3. Petitioner took the position that he was not engaged in a business of selling real estate to customers; and he reported all gains from sales of portions of the property as capital gains.↩