CHEVY CHASE LAND COMPANY OF MONTGOMERY COUNTY, MARYLAND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9875–77.     Filed June 12, 1979.

*John S. Nolan,* for the petitioner.
*Joyce H. Errecart,* for the respondent.

RAUM, *Judge:* The Commissioner determined a deficiency in income tax for the year 1971 in the amount of $51,471.74 against petitioner Chevy Chase Land Co. of Montgomery County, Md. After concessions, the sole issue remaining for decision is whether a landowner's costs of negotiating a prospective long-term lease of an unimproved tract of land and the costs of an unsuccessful attempt to have the land rezoned are deductible as an abandonment loss under section 165(a), I.R.C. 1954, upon termination of the lease transaction, which was contingent upon obtaining the rezoning.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

---

Petitioner Chevy Chase Land Co. of Montgomery County, Md. (Land Co.), is a corporation organized under the laws of the State of Maryland. At the time its petition was filed, petitioner's principal office was located in Chevy Chase, Md. It filed its return for the calendar year 1971 with the Office of the Internal Revenue Service at Philadelphia, Pa. For its 1970 and 1971 calendar years, it used the cash receipts and disbursements method of accounting for Federal income tax purposes.

Land Co.'s business consists of holding land for investment, leasing land under long-term ground leases, and developing and operating, directly or through subsidiaries, improvements such as shopping centers, office buildings, and apartment buildings. It acquires its income-producing properties either through development of its own land holdings or by purchase. It has not held real estate for sale since it stopped subdivision of residential properties in 1957.

Since 1890, Land Co. has owned a 19.398-acre undeveloped tract (the tract) on the southeast corner of the intersection of Jones Bridge Road and Connecticut Avenue in Montgomery County, Md. The tract fronts on Connecticut Avenue, a major thoroughfare running into Washington, D.C., and is situated less than one-half mile south of the junction between Connecticut Avenue and Interstate 495 (the Capital Beltway), a six-lane, limited access interstate highway that completely encircles Washington, D.C. The tract is now, and was during the period at issue, zoned R–90. Development of property zoned R–90 is limited to single-family detached residential structures. The controversy in this case centers primarily on the deductibility of expenditures made by Land Co. in an unsuccessful effort to obtain C–2 general commercial zoning for the tract.

Land Co. owns approximately 80 to 90 acres of undeveloped and developed property in the immediate vicinity of the tract, 20 to 30 of which are developed in townhouses, apartments, office buildings, bank properties, and in a shopping center. The shopping center (Chevy Chase Lake Shopping Center), immediately south of the tract and separated from the tract only by a public road, is zoned for light commercial uses. It includes a drugstore, a large general food store, a cafeteria, a county liquor store, a nursery, a gas station, a laundry, a flower shop, a hardware store, a dress shop, a beauty parlor, a bank, and a 13-story office building under construction in 1971. Land Co. also

owns a 20-acre undeveloped parcel, adjacent to the tract, situated directly across Connecticut Avenue to the west. This parcel was designated in the Bethesda-Chevy Chase Master Plan as a proposed site for a high school during the period at issue.

Federated Department Stores, Inc. (Federated), owns several department stores and chains of department stores throughout the country, including Bloomingdale's, a large retail department store chain based in New York City. Bloomingdale's specializes in selling expensive, high quality merchandise in a modern retail setting. In 1970, Federated became interested in leasing the tract from Land Co. for the purpose of constructing and operating a Bloomingdale's store. On March 11, 1970, after a series of negotiations, Federated and Land Co. "exchanged" an unsigned memorandum of understanding containing the principal terms of a proposed lease of the tract, including the lease term, rentals, renewal options, real estate taxes, and insurance obligations. It was agreed that the lease would be contingent upon obtaining rezoning for the tract permitting construction of a 250,000-square-foot building for occupancy by Bloomingdale's with offstreet surface parking on the tract.

On May 27, 1970, the Bloomingdale's division of Federated, as "contract lessee," and Land Co. jointly filed an application (No. F538) with the county council of Montgomery County to have 3.874 acres of the tract rezoned from R–90 to the C–2 general commercial classification. The 3.874 acres represented that portion of the tract on which the Bloomingdale's department store building was to be situated.[1] The C–2 zoning category encompasses a wide variety of retail and light industrial uses. Maryland zoning statutes at the time did not provide for a zoning classification limiting property to a particular use. Since a formal binding agreement for a lease had not yet been executed, Land Co. insisted that Federated participate in the zoning application in order to "tie down" the transaction. In the rather unlikely event that a formal binding agreement for a lease were not eventually entered into with Federated, Land Co. would have withdrawn the rezoning application even though

---

[1] A second zoning application was also filed in respect of the remaining acreage of the tract which was to be used for offstreet parking. This application was later withdrawn when it was determined that it was unnecessary under the zoning rules then in effect to have the proposed parking area rezoned.

such action might have prejudiced Land Co.'s right to reapply for rezoning of the tract in the future.[2]

In June of 1970, Federated and Land Co. entered into a formal written agreement, backdated to April 30, 1970, to execute a lease of the tract in a form appended to the agreement as an exhibit. The lease provided that the rental for the tract during the initial term was to be $330,000 per year plus 0.5 percent of gross sales in excess of $30 million. The initial term was 35 years, renewable for two terms of 15 years each and for a third term of 10 years. The foregoing rentals were subject to certain minimum provisions during any renewal term. Federated agreed to improve the tract with a low level, attractive building similar in design and quality to the Bloomingdale's store in Short Hills, N.J., for exclusive use as a Bloomingdale's store. Federated was to be obligated to pay all taxes, utilities, insurance, and other costs associated with the tract.

The rezoning contingency was fully described in the agreement. It was provided that Land Co. and Federated would share equally the fees and costs of the rezoning effort. Land Co. and Federated also agreed (although not in writing) that each would separately engage and pay for its own legal counsel in connection with the rezoning. Federated was given the option to cancel the agreement if, inter alia, an adverse ruling on the pending rezoning application was rendered by the Montgomery County Council.

The application to rezone the tract very quickly generated opposition from residents of neighboring communities. In response, Land Co. expended funds for a public relations program explaining Land Co.'s view of the community benefits of a Bloomingdale's store. One of the criticisms directed against the proposed rezoning was that the rezoned tract might be used for commercial purposes other than a Bloomingdale's store. To assure the community that it had no such intention, Land Co. recorded with the Montgomery County Land Records a "Declaration of Covenants" dated December 15, 1970, and an amendment dated January 12, 1971. These documents, to which Land Co. was the only party, purported to restrict future use of the

---

[2]Whether and the extent to which petitioner would have been prejudiced is not entirely clear on the record. It appears that petitioner was advised by counsel that the zoning law was amended to permit withdrawals of zoning applications without prejudice against future applications, effective June 1, 1970.

portion of the tract subject to rezoning to construction of a Bloomingdale's store. Land Co. was advised by counsel that the recorded documents were legally effective for that purpose. The restrictions were to be released at such time as zoning or other governmental approval of the project was denied, or when Bloomingdale's was given an occupancy permit.

The rezoning request was denied by a hearing examiner on June 25, 1971. The hearing examiner made written findings concerning the boundaries of the relevant neighborhood, whether there had been a sufficient change in the character of the neighborhood to justify rezoning, whether the zoning change was in harmony with the comprehensive zoning plan for the area, and whether the rezoning was in the public interest given the traffic impact of a Bloomingdale's store on the area. The findings and recommendations of the hearing examiner were adopted by a resolution of the Montgomery County Council on October 12, 1971. The council's denial of the rezoning application was not appealed.

After the adverse decision was rendered, Federated terminated the agreement to lease the tract from Land Co. as of October 31, 1971, in accordance with its express terms.

Land Co.'s major purpose in seeking rezoning of the tract was to obtain the Bloomingdale's lease and secure the large income stream produced thereunder. Federated was a $3-billion organization with a triple-A credit rating.

After the Federated agreement was terminated, Land Co. made no efforts of any kind with respect to rezoning, developing, leasing, or selling the tract at least until 1977. It was still the owner of the tract in 1978. Land Co.'s tentative plans in 1978 were to use the tract for construction of residential townhouses and not for commercial purposes. Land Co. based its perceptions concerning the future usefulness of the tract on its experience with the abortive Bloomingdale's project which demonstrated the existence and strength of community opposition to commercial development of the tract.

In connection with the Federated transaction, Land Co. paid expenses totaling $107,232.80—$53,086.40 in 1970, and $54,146.40 in 1971. These expenses included fees and charges by attorneys, engineers, public relations firms, traffic consultants, architects, urban planners, and other miscellaneous zoning costs. All of these expenses were incurred as part of the rezoning effort

except for a fee of $5,000 paid to the law firm of Stohlman, Beuchert, Egan & Smith in 1970. Only a small part of this fee ($200) was allocable to rezoning matters; the remaining $4,800 was allocable to the firm's representation of Land Co. in the negotiation and preparation of the agreement and lease with Federated. The costs of the Federated transaction were capitalized and treated as deferred charges on petitioner's books. Land Co. would have charged off (amortized) these costs over the term of the lease if the lease transaction had been consummated.[3]

In the course of the rezoning effort, Land Co. acquired various items such as the Federated agreement, architectural plans, traffic studies, reports, a public relations brochure, the zoning application, and the services of attorneys and other experts hired to prosecute the rezoning. One of these items, a topographical map of the tract costing Land Co. $1,500 in 1971, retained its value to petitioner after the zoning was denied. The president of Land Co. was of the opinion that none of the other zoning expenditures retained any continuing value to Land Co. after the zoning was denied.

On its 1971 return, Land Co. deducted the $107,232.80 amount expended on the Federated project as a "loss on abandonment of proposed development costs."

OPINION

Petitioner incurred expenses totaling $107,232.80 in 1970 and 1971 in connection with the Bloomingdale's lease transaction with Federated. After the crucial zoning change was denied in 1971, Federated canceled its agreement to lease the tract. On its 1971 return, petitioner deducted the $107,232.80 expended on the Bloomingdale's transaction as an abandonment loss under section 165(a). We hold that, except for a $1,500 item hereinafter discussed, petitioner is entitled to the deduction which it claimed.

The parties are in agreement that all of the expenditures on the Bloomingdale's project were nondeductible capital expenditures at the time they were made. Thus, the only issue is whether on the facts of this case, the expenditures became

---

[3]However, no finding is made here as to the propriety of such chargeoffs.

deductible as an abandonment loss after the lease transaction was terminated.

In general, a deductible loss is sustained "during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165–1(d)(1), Income Tax Regs. And in certain cases, an "abandonment loss" deduction is allowed upon the sudden termination of usefulness of property. Section 1.165–2(a), Income Tax Regs., provides, in pertinent part, that:

A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.[4]

It is of course well established that rezoning expenses are not deductible when made, since they represent a capital outlay —a matter conceded by petitioner, as already noted. Cf. *Soelling v. Commissioner*, 70 T.C. 1052, on appeal (9th Cir., Jan. 9, 1979). Also, zoning costs have been held to be "capital expenditures, not amortizable because indefinite and undeterminable in the duration of their consequence, and recoverable through addition to the basis of the property rather than through periodic deduction." *Galt v. Commissioner*, 19 T.C. 892, 910 (1953), revd. in part and affd. in part on other issues 216 F.2d 41 (7th Cir. 1954), cert. denied 348 U.S. 951 (1955). Moreover, even the cost of an unsuccessful attempt to obtain a zoning change has been regarded as retaining its character as a capital outlay and therefore ordinarily not deductible in the year incurred. *Godfrey v. Commissioner*, 335 F.2d 82, 85 (6th Cir. 1964), affg. a

---

4Sec. 1.165–2, Income Tax Regs., applies to losses from abandonment of nondepreciable property; par. (c) of that regulation states that the deductibility under sec. 165(a) of losses arising from abandonment of depreciable property is governed by secs. 1.167(a)–8 and 1.167(a)–9, Income Tax Regs. Although petitioner argues on brief that the Federated expenditures would have been subject to an allowance for amortization, neither petitioner nor the Commissioner relied on the sec. 167 regulations. However, even assuming that sec. 167, rather than sec. 165, of the regulations contains the provisions that are more appropriately applicable here, we are satisfied that the differences between them are not material in the context of this case. Compare sec. 1.165–2(a), Income Tax Regs., with sec. 1.167(a)–8(a)(3)(i) and (a)–8(b) (last sentence), Income Tax Regs.

Memorandum Opinion of this Court, cert. denied 379 U.S. 966 (1965).[5] However, the instant case presents a unique set of facts that is not controlled by any of these cases.

The rezoning effort before us was inextricably tied to the Bloomingdale's lease transaction. It represented a joint attempt by petitioner and Federated to obtain the desired change of the zoning classification. The purpose of the rezoning was limited—as evidenced by the Declaration of Covenants—to the construction of a specified type of Bloomingdale's department store, and the agreement for lease between petitioner and Federated was limited explicitly to the success of the rezoning proceedings. When the rezoning effort failed, Federated exercised its right under the agreement to terminate the entire transaction.

"The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal test." *Lucas v. American Code Co.*, 280 U.S. 445, 449 (1930). In this case, for all practical purposes the adverse zoning ruling brought the entire matter to an abrupt end. Except for a comparatively minor item, nothing of any consequence remained; petitioner regarded the future commercial development of the area as foreclosed; and, apart from a topographical map of the tract, none of the items acquired in the course of the rezoning effort were thought to have any continuing value to Land Co. or were in fact used in its business after the Bloomingdale's transaction was terminated.[6] In every real sense there was a definite and final loss of the costs of the rezoning effort and the lease negotiation incurred in connection with the abortive Bloomingdale's department store transaction. We conclude that on the unusual facts here involved there was an abandonment loss that may appropriately be deducted.

It should be noted that the assets for which the abandonment loss is claimed (the reports, studies, testimony, and legal services employed in the rezoning effort and the lease negotiation with

---

[5]In *Godfrey v. Commissioner*, 335 F.2d 82, 84–85 (6th Cir. 1964), affg. 22 T.C.M. 1, 32 P–H Memo T.C. par. 63,001 (1963), cert. denied 379 U.S. 966 (1965), the issue considered by the Court was the deductibility of unsuccessful zoning expenses under sec. 212(2) (ordinary and necessary expenses incurred for the management, conservation, or maintenance of property held for the production of income); the propriety of an abandonment loss deduction under sec. 165(a) was not at issue. See also 22 T.C.M. at 6–7, 32 P–H Memo T.C. par. 63,001, at 63–7—63–8.

[6]"The subjective judgment of the taxpayer (here the management) as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer." *A. J. Industries, Inc. v. United States*, 503 F.2d 660, 670 (9th Cir. 1974).

Federated) are intangible assets. They represent not an interest in the land itself, but rather "intangible asset[s] * * * separable and identifiable from the land * * * capable of being discarded and abandoned * * * and * * * subject to a claim for a deductible loss." *A. J. Industries, Inc. v. United States*, 503 F.2d 660, 663 (9th Cir. 1974). Thus, we find cases such as *Louisiana Land & Exploration Co. v. Commissioner*, 7 T.C. 507 (1946), affd. 161 F.2d 842 (5th Cir. 1947), which deny a deduction for the loss of value of land when it proves to be worthless for a particular purpose (but not wholly worthless), to be inapposite under the facts of this case. Petitioner is not claiming a loss for any decrease in the value of the tract.

Included among the costs incurred, however, was an expenditure of $1,500 for a topographical map of the tract. Plainly, this map has continuing value, and it would obviously be useful in any townhouse development which petitioner is now considering for the property. There was no abandonment in respect of this map, and petitioner does not now contest the Commissioner's determination to the extent that it relates to this item. Petitioner's deductible loss must therefore be revised downward so as to exclude the cost of the topographical map.

*Decision will be entered under Rule 155.*