NORMAN R. and CAROLINE W. PICKERING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Pickering v. Commissioner
Docket No. 9746-77.
United States Tax Court
T.C. Memo 1979-243; 1979 Tax Ct. Memo LEXIS 286; 38 T.C.M. (CCH) 964; T.C.M. (RIA) 79243; June 25, 1979, Filed *286 Petitioners purchased farmland in 1951, but did not work or live on the land until 1969. From 1969 to, and including, the taxable years involved, petitioners sharecropped their tobacco allotment, and raised some hay for the feeding of their small number of horses and beef cattle. However, the facts show that petitioners did not approach the operation of the farm during the taxable years involved with the intent of making a profit. Held, petitioners are not entitled to deduct farm expenses in excess of those allowed by section 183, I.R.C. 1954; held further, petitioners are not allowed an investment credit on certain farm equipment; held further, this Court is without jurisdiction to award attorney's fees to petitioners. Quentin Housholder and Alan C. Housholder, for the petitioners. Shuford A. Tucker, Jr., for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years 1972 and 1973 in the amounts of $4,501.61 and $6,484.14, respectively, as set forth in his statutory notice of deficiency dated June 22, 1977. Petitioners do not question respondent's determination with respect *287 to certain medical expense and taxes paid deductions. Remaining issues for our decision here are (1) whether the petitioners operated their farm in 1972 and 1973 as an "activity * * * not engaged in for profit" controlled by section 183 of the Internal Revenue Code of 1954, [1](2) whether petitioners are entitled to an investment tax credit for 197, and (3) whether petitioners are entitled to an award of attorney's fees in this action. FINDINGS OF FACT Some of the facts have been stipulated and, with two exceptions (see footnotes 2 and 5 infra), they are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Norman and Caroline Pickering, have lived at Sumday Farm, Route 5, Liberty Pike, Franklin, Tennessee (hereinafter Sumday) from sometime in 1969 to the present. Therefore, petitioners were living at Sumday both when they timely filed their joint income tax returns for the taxable years 1972 and 1973 with the Internal Revenue Service Center, Memphis, Tennessee, and when they filed their petition in this *288 case. During 1972 and 1973, Norman received salaries of $51,514.26 and $55,634.43, [2] respectively, from American Airlines as a pilot, a position he had held since 1940. Having retired from American Airlines on August 3, 1977, Norman now draws a pension from the retirement program to which he contributed during the years of his employment, including 1972 and 1973. In addition to Norman's salary, petitioners received investment income in the form of savings account interest and stock dividends during 1972 and 1973, totalling $349.39 and $466.49, respectively. In contrast, Sumday has not produced gains. Sumday, consisting of approximately 183 acres, was purchased by petitioners in 1951 for approximately $37,500.00. From 1951 to 1969, Sumday was operated under a lease by another family. Sumday was in poor condition in 1969. Nevertheless, even though Norman's farm experience was limited to working on a farm in upstate New York during *289 a few summers when he was a boy and to working part-time during three years on a farm in Tennessee inherited by Caroline in 1949, petitioners moved to Sumday in 1969. Caroline, who had been raised on a farm, and Peter, petitioners' son who had worked odd jobs for a cattleman while in college, provided the only other farming experience in petitioners' family. Yet, petitioners' family, including their daughter Norma, and their other son, Cliffe, did most of the farm work. From 1969 through 1973, petitioners began to repair the barn, to refurbish the spring house, to replenish the granary, to work the fences and to improve both the pastures and the hayfields. In addition to a general lack of experience, these tasks were further complicated by the fact that Norman was absent from Sumday ten to sixteen days each month working for American Airlines. Since they had no hired hands, petitioners were lacking in both labor and experience. To offset this lack and reduce their workload, petitioners sharecropped their tobacco allotment, received help from their neighbors, and hired out certain odd jobs to various workers. In addition to the small tobacco allotment, which was sharecropped, *290 Sumday was also used during 1972 and 1973 to raise a few horses, beef cattle, and hay. Five horses were maintained at Sumday during the years in question. While one was used exclusively by Peter to run cattle, the other four were mostly for show. The show horses were tended by Norma and Carolina, who had been around horses during her childhood and was an active member of the United States Pony Club. Although a large portion of petitioners' documented expenses were related to these horses, they were shown only three to four times each year.
Petitioners began their beef cattle herd in 1969 by purchasing ten cows and their calves. Using the natural increase method [3] and making later purchases of a bull and six cows, petitioners built their herd to approximately thirty cattle by the end of 1973. Petitioners sold some of their cattle as part of the natural increase method, reporting the sale of six calves in 1972 and one calf in 1973 on the respective joint income tax returns for those years. [4] Originally, petitioners estimated that their cattle operation at Sumday would be profitable six years after their start in 1969. In contrast, although not experts, petitioners' own witnesses *291 testified that, using the natural increase method with petitioners' beginning herd, it would take ten years or more to build a herd to a profitable size for Sumday. Advice was available to petitioners from various state and Federal government services to aid in the management of the land and the livestock of Sumday. Nevertheless, other than the use of the natural increase method to enlarge their cattle herd, petitioners had *292 no specific, detailed program for the development of Sumday and never participated in any government farm programs. Management of both Sumday's finances and petitioners' personal finances was conducted from a single checking account. Each month Norman separated the various bills and invoices into farm and non-farm groupings, paid each accordingly, and entered the farmamounts into a ledger. However, this system did not always provide a clear-cut division between farm and personal expenses. For instance, in the grouping of cancelled checks labelled as written for farm expenses in 1972 and 1973 were checks to various motels (Air Host, Imperial 400 Motels, O'Hare Concord Inn), American Airlines, Bureau of Customs, Christmas Seals, Garden Club, and petitioners' church. Nevertheless, petitioners' records did show clearly that petitioners purchased $6,479.73 in depreciable assets for Sumday in 1973, but purchased no such assets for Sumday in 1972. Yet, even with these purchases, petitioners borrowed only $5,981.70 from all sources in 1973. From petitioners' arrival on the 183-acre farm in 1969 to and including 1973, Sumday was operated at a loss. The figures for 1972 and 1973 are as *293 follows: Year
Income
Expenses
Loss
1972
$1,991.39 [5]
$12,065.67
$10,074.28
1973
1,522.40
15,166.67
13,644.27
Meanwhile, two of petitioners' neighbors, who testified on behalf of petitioners and who had no major income sources other than their farms, were making profits on their farms of less acreage. Respondent has determined that petitioners' losses from Sumday are not deductible against their non-farm income for 1972 and 1973. To the contrary, petitioners contend that they operated Sumday in 1972 and 1973 in a proper business manner for the intended purpose of making a profit and that they should thus be allowed full use of their farm losses. In their petition, petitioners also seek an investment tax credit *294 for 1973, not claimed earlier, and attorney's fees in this action. ULTIMATE FINDING OF FACT During the taxable years 1972 and 1973, petitioners were not operating Sumday with the intent of making a profit. OPINION Our decision here is founded on section 183(a) which provides that deductions attributable to an activity not engaged in for profit will not be allowed, except as noted in section 183(b). Under section 183(b)(1), those deductions which would be allowed regardless of whether the activity is engaged in for profit are allowed. Sec. 1.183-1(b)(1), Income Tax Regs. Under section 183(b)(2), further deductions are allowed, as if the activity were engaged in for profit, but only to the extent that gross income from the activity in the taxable year exceeds the deductions allowed by section 183(b)(1). Whether an activity is for profit or not for purposes of section 183 is determined as under sections 162 and 212. Section 183(c). However, a rebuttable presumption of profit activity is raised under section 183(d) if gross income from the activity exceeds related deductions either for any two of five consecutive taxable years, or, if most of the activity involves the raising of *295 horses, for any two of seven consecutive taxable years. Since Sumday has operated at a loss from 1969 to 1973, the presumption is not raised. Thus, we must proceed under the test of sections 162 and 212 which depends upon whether petitioners' primary purpose and intent with respect to the activity examined was the making of a profit. Allen v. Commissioner, 72 T.C.     (April 2, 1979); Dunn v. Commissioner,70 T.C. 715 (1978). Jasionowski v. Commissioner,66 T.C. 312 (1976); Benz v. Commissioner,63 T.C. 375 (1974). A good faith expectation of profit, although unreasonable, will suffice. Section 1.183-2(a), Income Tax Regs.; Dunn v. Commissioner,supra;Benz v. Commissioner,supra.
The question of petitioners' intent is a factual one on which the petitioners bear the burden of proof. Boyer v. Commissioner,69 T.C. 521 (1977); Benz v. Commissioner,supra;Johnson v. Commissioner,59 T.C. 791 (1973), affd. 495 F.2d 1079 (C.A. 6, 1974) cert. denied 419 U.S. 1040 (1974). As guidelines for our determination of petitioners' intent, we look to the nine factors, most of which were condensed from prior case law, which are listed in section 1.183-2(b), Income Tax Regs.Allen v. Commissioner,supra; *296 Boyer v. Commissioner,supra;Benz v. Commissioner,supra.Briefly stated, the list includes (1) the manner in which the activity was conducted; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended on the activity; (4) the expectation of related asset appreciation; (5) the success of the taxpayer in similar or dissimilar activities; (6) the history of income or loss of the activity; (7) the amount of profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. However, since our determination is to be based upon all of the facts and circumstances of the situation, each of those factors is only a guideline and no one factor is conclusive. Section 1.183-2(b), Income Tax Regs.; Allen v. Commissioner,supra; Dunn v. Commissioner,supra;Jasionowski v. Commissioner,supra.Succeeding paragraphs, which set forth the various points upon which our decision rests, will incorporate some of these factors. Overall, Sumday was not operated in a businesslike manner. Petitioners did maintain a ledger of Sumday income and expenses. However, petitioners had only one checking account. *297 Thus, the ledger was used merely to provide a record of Sumday expenses, separate from that of petitioners' personal expenses. Even though the ledger was petitioners' only formal record for Sumday, it was not wholly reliable. Time and again, Norman's testimony on these records and other evidence on financial matters were in conflict. Further, without any other records, petitioners, purportedly very dependent on the natural increase method of herd development, could not provide this Court with even a single exact figure for the number of cattle they held at the end of 1973, much less consistent figures of change in the herd during the year. Even if petitioners had more reliable records, such records would have been of little use, since petitioners had no plan of development for Sumday by which the records could be analyzed. While petitioners continued to operate Sumday in this manner, at a loss, their neighbors, dependent upon farming for their livelihood, operated their smaller farms at a profit. Perhaps one reason for Sumday's losses is petitioners' lack of experience in farming. Norman's farm experience was limited to a few summers of his boyhood on a farm in upstate New York *298 and to three years spent part-time on a farm in Tennessee inherited by Caroline. Caroline, who had been raised on a farm, and Peter, who had worked odd jobs for a cattleman while in college, provided little more experience. Further, petitioners had no regular hired hands whose experience could be used. In addition, petitioners rarely followed the advice of experienced state and Federal advisors. Compounding the problem of having little experience, Norman spent from one-third to one-half of each month away from Sumday at his primary income occupation as an airline pilot. The operation of Sumday did not reduce the time Norman spent as a pilot. Petitioners accurately point out that the land and livestock of Sumday has appreciated since 1951 and 1969, respectively. However, this appreciation is attributable as much or more to general price increases as to the farming operations on Sumday. Section 1.183-1(d)(1), Income Tax Regs.
Having never been on a farm for any extended period prior to moving to Sumday, petitioners made no showing of any prior farming successes or failures other than the continued losses of Sumday. Fortunately, petitioners were able to absorb these losses. With *299 Norman's salary of over $50,000 each year, petitioners were able, not only to absorb total losses in 1972 and 1973 of $23,718.55, but also to purchase $6,479.73 of s assets for Sumday while only borrowing $5,981.70. Meanwhile, petitioners retained their stock and savings, which earned dividends and interest, respectively. Such financial resources could have been used to acquire a productive herd and the experienced help to maintain that herd if petitioners had truly desired to produce a profit. On the other hand, with such resources, petitioners were not as dependent upon a profitable farm operation for their livelihood as were their more profitable neighbors. Petitioners point out that there was no swimming pool nor any tennis court located on the land of Sumday. While this may show that Sumday was not intended as a recreational spot, we must point out to petitioners that items of personal pleasure are not limited to tennis courts and swimming pools. Show horses may also be considered items of personal pleasure, especially by a young woman such as Norma, or by someone as active in the United States Pony Club as Caroline. Although they maintained a ledger for Sumday expenses, *300 had no swimming pool or tennis court on their property, and maintained a small number of livestock, petitioners otherwise do not fare well relative to the factors of section 1.183-2(b), Income Tax Regs. At most, during 1972 and 1973, petitioners were merely developing a herd of cattle and amassing the necessary assets to support that herd which might prove profitable at some future time. [6]
Therefore, we find that petitioners did not operate Sumday in 1972 and 1973 for the purpose of making a profit. Respondent's disallowance of the claimed losses is thus sustained. Cf. Golanty v. Commissioner, 72 T.C.    , (June 5, 1979). Next, we turn to petitioners' claim, found only in their petition, *301 for an additional investment credit for 1973. It has been shown that $6,479.73 of assets were purchased by petitioners in 1973. Beyond this showing, petitioners presented no proof at trial relative to the useful life of these assets or to the new or used condition of them. Further, petitioners have not addressed this interesting issue anywhere in their briefs subsequent to trial. We, therefore, have no basis for allowing the computation of the investment tax credit. [7] *302 We must regard this issue abandoned by petitioners. Bussabarger v. Commissioner,52 T.C. 819, 829 (1969); cf. Walker-Scott Corp. v. Commissioner,35 T.C. 34, 37-38 (1960). Finally, petitioners assert a general claim for attorney's fees. As stated in numerous cases in the past, this Court is without jurisdiction to award attorney's fees to petitioners. E.G. Key Buick Co. v. Commissioner,68 T.C. 178 (1977), on appeal (C.A. 5, Aug. 15, 1977); Sharon v. Commissioner,66 T.C. 515, 533-534 (1976), affd. 591 F. 2d 1273 (C.A. 9, 1978). *303 Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Apparently, as the result of a typographical error, the parties stipulated that Norman's salary for 1973 was $55,734.43, rather than the correct figure of $55,634.43, which appears on the Forms W-2 and 1040 for 1973 and respondent's notice of deficiency.↩
3. Briefly, under the natural increase method of herd development each cow of bearing age is bred to produce a calf. Those calves which survive are then examined for physical traits conforming to those desirable in the final herd. Those calves with desirable traits are retained, while those without such traits, as well as older cattle which are no longer useful for breeding purposes, are sold or otherwise disposed of. ↩
4. A more accurate statement of the facts surrounding petitioners' cattle is not possible, due to Norman's inconsistent, confused testimony on this matter. Not only did Norman's testimony contradict other evidence of herd size and growth, but also did both of these sources contradict the statements on pertitioners' joint returns for 1972 and 1973.↩
5. An arithmetic error on petitioners' joint return for 1972 caused total farm income and farm loss to be stated as $1,981.39 and $10,084.28, respectively, rather than the correct amounts of $1,991.39 and $10,074.28 shown above. The incorrect amounts were also used, not only in the stipulation of facts, but also in the notice of deficiency. Therefore, correction of this error will require a computation under Rule 155 if petitioners' contentions with respect to the farm losses are sustained.↩
6. Cf. Wallendal v. Commissioner,31 T.C. 1249 (1959); Westervelt v. Commissioner,8 T.C. 1248 (1947). Our reasoning in Wallendal was also applied to the cattle-raising business under facts very similar to those of the instant case in Godfrey v. Commissioner,22 T.C.M. 1 at 5, 32 P-H Memo T.C. par. 68,001 at 63-5 to 63-6 (1963), affd. 335 F. d 82 (C.A. 6, 1964), certiorari denied 379 U.S. 966 (1965); and Miner v. Commissioner,21 T.C. M. 1173↩ at 1177, 31 P-H Memo T.C. par 62,222 at 62-1298 (1962).
7. Petitioners' claim would have failed, nevertheless. In the excerpts pertinent to that instant case, section 48(a)(1) defines property qualifying for the investment credit under section 38 as follows: SEC. 48. DEFINITIONS: SPECIAL RULES. (a) Section 38 Property-- (1) In General.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property (other than an air conditioning or heating unit), or * * *
Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. [Emphasis supplied] This definition requires more than merely depreciable property. More specifically, it requires the property to be that upon which depreciation may be taken by the taxpayer seeking the investment credit in the taxable year for which the credit is sought. Section 1.48-1(b)(1), Income Tax Regs.; Anderson v. Commissioner,446 F. 2d 672 (C.A. 5, 1971), affirming 54 T.C. 1035 (1970); cf. Coca-Cola Bottling Co. of Baltimore v. United States,203 Ct. Cl. 18, 487 F. 2d 528 (1973). Since petitioners did not have sufficient income from Sumday in 1973 to take depreciation deductions on the assets under section 183↩, the assets purchased in 1973 would not be eligible for the investment tax credit.