T.C. Memo. 2005-34


UNITED STATES TAX COURT


MAGUIRE/THOMAS PARTNERS FIFTH & GRAND, LTD., MAGUIRE/THOMAS
PARTNERS GRAND PLACE TOWER, LTD., TAX MATTERS PARTNER, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

MAGUIRE/THOMAS PARTNERS LIBRARY SQUARE, LTD., MAGUIRE/THOMAS
PARTNERS, HOPE PLACE, LTD., TAX MATTERS PARTNER, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9834-00, 9835-00.     Filed February 28, 2005.


Brian J. Seery and David H. Benz, for petitioners.

Bradley T. Stanek and Michelle Leichtman, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge: Respondent issued two notices of final
partnership administrative adjustment, in which respondent
determined the following adjustments to the losses of

Maguire/Thomas Partners Library Square, Ltd. (Library Square) and Maguire/Thomas Partners Fifth & Grand, Ltd. (Fifth & Grand):

| Year | Adjustments | |
| | Library Square | Fifth & Grand |
|------|----------------|---------------|
| 1989 | $1,468,471 | -- |
| 1990 | 863,015 | -- |
| 1991 | 1,973,438 | $2,854,831 |
| 1992 | 1,783,227 | 561,975 |
| 1993 | 1,616,793 | -- |
| 1994 | 1,474,134 | 561,975 |
| 1995 | 1,331,648 | 561,975 |
| 1996 | 1,212,751 | 561,975 |

Library Square built and operates Library Tower, a 73-story building in Los Angeles, California. Fifth & Grand built and operates Grand Place Tower, a 55-story building in Los Angeles. Both of these buildings were built pursuant to a development agreement reached in 1985 between Maguire/Thomas Partners, Ltd. (MTP) and the Community Redevelopment Agency (CRA) of the City of Los Angeles. To develop the Library Tower building, MTP paid CRA $33,192,567 for certain land and development rights. To develop the Grand Place Tower building, MTP paid CRA $17,700,000 for development rights. MTP obtained the right to develop the property at greater density (i.e., to build larger buildings) than would have otherwise been permitted. Library Square and Fifth & Grand are the successors-in-interest to the rights and obligations of MTP under that agreement.

After concessions, the issues for decision are:

1. Whether Library Square may deduct depreciation it claimed for the cost of obtaining development rights for 1989 through 1996. We hold that it may to the extent discussed below.

2. Whether Fifth & Grand may deduct depreciation it claimed for the cost of obtaining development rights for 1991, 1992, 1994, 1995, and 1996. We hold that it may to the extent discussed below.

References to petitioners are to petitioner Maguire/Thomas Partners, Hope Place, Ltd. (Hope Place), the tax matters partner of Library Square, and petitioner Maguire/Thomas Partners Grand Place Tower, Ltd. (Grand Place), the tax matters partner of Fifth & Grand. Section references are to the Internal Revenue Code in effect for the years in issue, unless stated otherwise. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners and Their Limited Partnerships

1. Petitioners

When the petitions were filed, the principal place of business for each partnership and its tax matters partner was Los Angeles, California.

2. The Limited Partnerships

Library Square and Fifth & Grand are limited partnerships organized under California law. Library Square operates Library

Tower, a 73-story office building in Los Angeles. Fifth & Grand operates Grand Place Tower, a 55-story office building in Los Angeles.

B.   The Community Redevelopment Agency, Rehabilitation of the Central Library, and the Library Square Development Project

1.   The Community Redevelopment Agency

CRA is an independent administrative agency formed under the Community Redevelopment Law, Cal. Health & Safety Code secs. 33000-33800 (West 1999 & Supp. 2000), to implement redevelopment plans in the City of Los Angeles (the City). CRA is not a division or department of the City. Cal. Health & Safety Code sec. 33122 (West 1999). CRA is subject to local zoning laws. Cal. Govt. Code sec. 53091 (West 1997 & Supp. 2004).

2.   Bunker Hill Redevelopment Plan and Central Business District Redevelopment Plan

The property involved in these cases was subject to the Bunker Hill Redevelopment Plan (BH Plan) and the Central Business District Redevelopment Plan (CBD Plan). The City enacted ordinances in 1970 and 1975 approving the BH Plan and the CBD Plan.

3.   Library Square Development Project

The City's Cultural Heritage Board designated the Los Angeles Central Library (Central Library) as an historical building in 1967. In 1981, the City gave to CRA the task of rehabilitating the Central Library at no cost to the City.

CRA's plan to rehabilitate the Central Library became a part of the Library Square development project. We refer to the parcel of land on which the Central Library is located and four other parcels on which private development was planned as the Library Square tract. The Library Square tract consists of: (1) The Library Tower parcel, (2) the Garage Plaza parcel, (3) the Grand Place Tower parcel, (4) the One Bunker Hill parcel, and (5) the Central Library parcel. These five parcels are contiguous or separated only by public streets or rights of way.

In September 1983, CRA requested proposals under which the City and CRA would sell the Garage Plaza land and the development rights to the Central Library parcel and part of the Central Library parcel to a developer to facilitate development of an adjacent or nearby site. CRA hoped to finance the rehabilitation of the Central Library through that sale.

4. <u>Ownership of the Five Parcels</u>

During 1984, MTP and CRA negotiated the proposed Library Square development project. MTP then owned parts of the Library Tower and Grand Place Tower parcels. An entity related to MTP owned the One Bunker Hill parcel. The City owned the Central Library and Garage Plaza parcels and part of the Library Tower parcel and the public streets and rights of way to be included in the Library Square tract. MTP proposed to build an approximately 71-floor building on the Library Tower parcel, an approximately

65-floor building on the Grand Place Tower parcel, and an underground parking garage on the Garage Plaza parcel.

C.   Building Density Limitations for the Library Square Tract

   1.   Floor Area Ratio Limits

The Library Square tract was subject to the CBD Plan.  A small part of a public right of way in the tract was subject to the BH Plan.  During 1984 and 1985, the CBD and BH Plans generally restricted development of parcels in the Library Square tract to a maximum building density or floor area ratio (FAR) of six times the buildable area[1] of that building site.  The maximum FAR under the CBD Plan was 6 to 1.  The BH Plan restricted development to a maximum FAR of 5 to 1.

Under section 437 of the CBD Plan and section 814 of the BH Plan, CRA could grant a variation (i.e., a variance) to a landowner to build a building exceeding the maximum FAR that otherwise would have applied to that property.   The CBD and BH Plans generally permitted one landowner to sell the unused building density for that landowner's property to a second landowner, which would allow the second landowner to build a higher density building.  See, e.g., sec. 418 of the CBD Plan. Transferred building density was called transferred FAR (TFAR).

---

[1] Under the CBD Plan, buildable area is based on a parcel's area less any public streets, sidewalks, or rights of way to which the parcel is subject.

<u>Id.</u>[2]  The transfer of building density typically was accomplished
by the first landowner's recording a covenant running with the
land against the first landowner's property in favor of the
second landowner's property.[3]  Neither the City nor CRA
transferred FAR to MTP in connection with Phases I, II, and III
of the Ownership Participation Agreement (OPA)[4] between CRA and
MTP under section 418 of the CBD Plan.

>    2.    <u>Buildable Area Limits Imposed by the Los Angeles City
>          Charter</u>

In addition to the maximum FAR imposed by the CBD and BH
Plans, the Los Angeles City Charter (City Charter) restricted
development to 13 times the buildable area of the building site.
CRA could grant a landowner a variation to exceed the maximum FAR
limits of the CBD and BH Plans; however, CRA could not permit by
variation construction of a building in excess of the City
Charter's 13-to-1 limitation.

>    3.    <u>Treatment of the Library Square Tract as One Building
>          Site</u>

Under the City Charter, the Library Tower and Grand Place
Tower parcels were separate building sites.  If the Library Tower
and Grand Place Tower parcels were treated as separate building

---

[2]See <u>Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles</u>,
268 Cal. Rptr. 356, 357-359 (Ct. App. 1990).

[3] See <u>id.</u> at 358.

[4] See discussion at par. D of the Findings of Fact below pp.
9-11.

sites, the FAR for each of the proposed Library Tower and Grand Place Tower buildings would exceed 23 to 1.

During MTP's and CRA's negotiation of the Library Square development project in 1984, it was proposed that the City enact an ordinance treating the Library Square tract as a single building site.  Under this ordinance, CRA would issue variations to MTP permitting MTP to build Library Tower and Grand Place Tower buildings as follows:

## Table 1

| Parcel | Buildable Area Sq. Footage | | Permitted FAR | Total Permitted Net Floor Area Sq. Footage | |
| | Gross | Net | | Without Ord. & CRA Variation | With Ord. & CRA Variation |
|---|---|---|---|---|---|
| Library Tower | 69,277 | 55,600 | 6.0 : 1 | 333,600 | 1,300,000 |
| Garage Plaza | 75,000 | 75,000 | [1]7.5 : 1 | 562,500 | [2]6,000 |
| Grand Place Tower | 60,500 | 52,500 | 6.0 : 1 | 315,000 | 1,200,000 |
| One Bunker Hill | 30,384 | 30,400 | [3]7.2 : 1 | 220,000 | 240,000 |
| Central Library | 147,211 | 147,211 | [1]7.5 : 1 | 1,104,083 | 361,000 |
| Totals | 382,372 | 360,711 | | 2,535,183 | 3,107,000 |

Overall FAR:  [4]8.12

[1] Includes a 25 percent density bonus for rehabilitation and expansion of the Central Library.

[2] To be built within a building footprint not exceeding 3,000 square feet.

[3] The square footage of the existing building.

[4] Computed on the basis of gross buildable area square footage (3,107,000 divided by 382,372, i.e., about 8.12).  The City's Central City Community Plan provides for calculating FAR based on gross buildable square footage, and the CBD Plan provides for calculating FAR based on net buildable square footage.  Overall FAR with respect to the five parcels would be 8.61 if computed on a net buildable square footage basis. (3,107,000 divided by 360,711, i.e., about 8.61.)

The City and CRA wanted MTP to build the Library Tower and Grand Place Tower because these buildings would enhance the value of the Library Square project, thereby increasing the fee that CRA could charge MTP for the Garage Tower parcel land and the Central Library parcel density rights.  CRA would use that higher fee to finance the rehabilitation of the Central Library.

D.  The Ownership Participation Agreement, the Cooperation Agreement, the MTP Designated Building Site, and the Library Tower and Grand Place Tower Variations

The City, CRA, and MTP reached two principal agreements relating to the Library Square project in 1985:  (1) The Owner Participation Agreement (OPA) between CRA and MTP, and (2) the Cooperation Agreement between the City and CRA (the Cooperation Agreement).  The final Cooperation Agreement was virtually identical to the draft cooperation agreement attached to the OPA.

1.  The Ownership Participation Agreement

Library Tower and Grand Place Tower were developed under the OPA reached by MTP and CRA on July 9, 1985.[5]

MTP's obligations under the OPA were conditioned on designation of the Library Square tract as a designated building site pursuant to Ordinance No. 159802 (the MTP designated

---

[5] Library Square and Fifth & Grand are successors in interest to the rights and obligations of MTP under the OPA. Robert F. Maguire III (Maguire) and James A. Thomas (Thomas) were the principals of MTP, and they controlled Library Square and Fifth & Grand.

building site).[6]  Attachments to the OPA included: (1) A draft MTP designated building site application, and (2) drafts of the variations that the City, CRA, and MTP expected CRA to issue to MTP with respect to the planned Library Tower and Grand Place Tower buildings.  MTP's obligations under the OPA were also conditioned on CRA's showing that the variations for the Library Tower and Grand Place Tower buildings had been approved and were in effect.

The OPA provided for development of the Library Square project in three phases.  Phase I covered the development of the Library Tower building.  Phase II covered the development of an underground parking garage and a garden plaza on the Garage Plaza parcel.  Phase III covered MTP's option to develop the Grand Place Tower building on the Grand Place Tower parcel.

During Phase I, CRA conveyed to MTP the Garage Plaza parcel and other land (including part of the Library Tower parcel), all of which CRA had obtained from the City pursuant to the Cooperation Agreement.  CRA transferred the Garage Plaza parcel subject to a permanent easement retained by the City to maintain a garden plaza on the parcel.  MTP paid $33,192,567 to CRA to acquire development rights and land in connection with Phases I and II.  MTP paid $17,700,000 to CRA to acquire development

---

[6] We discuss Ordinance No. 159802 at Findings of Fact par. B-3, below pp. 12-14.

rights in connection with Phase III and to develop the Grand Place Tower building. The Grand Place Tower parcel was assembled from land that MTP owned.

2.  The Cooperation Agreement

A general purpose of the Cooperation Agreement was to preserve and rehabilitate the Central Library. Under the Cooperation Agreement, CRA pledged to spend up to $110,400,000 ($48,975,000 of which CRA would obtain from MTP pursuant to the OPA) for that purpose. CRA made the pledge to the City in consideration for land and other rights it would receive from the City under the Cooperation Agreement. CRA, in turn, would convey this land and other rights to MTP pursuant to the OPA.

The City conveyed the Garage Plaza parcel, part of the Library Tower parcel, and other land to CRA. CRA conveyed that land to MTP pursuant to the OPA. Under the Cooperation Agreement, CRA agreed to reserve the same easements, rights, and covenants that the City had reserved in its conveyance to CRA.

Under the Cooperation Agreement, the City agreed to record a covenant running with the land for the benefit of the City and CRA against the Central Library parcel limiting the Central Library building to 361,000 square feet and prohibiting further development of the Central Library parcel. The City executed and recorded this covenant with the Los Angeles County Recorder in 1987. The covenant is binding on the owner of the Central

Library parcel and any future owners until released by the City Council and CRA. Under the Cooperation Agreement, the City also agreed to record a covenant running with the land for the benefit of the City against the Central Library parcel which met the requirements of the MTP Designated Building Site Application and Ordinance No. 159802.[7]

3.   The MTP Designated Building Site

The City enacted Ordinance No. 159802 on April 30, 1985. Ordinance No. 159802 defines a "designated building site" as an area of real property, located within the CBD and/or BH Plan area, which consists of parcels that are contiguous or separated only by public streets or rights of way, and which is designated by the City Council to implement the preservation of a City-owned and operated historic structure. This ordinance permitted parts of the designated building site to be owned by different parties, and it required an application for such designated building site to be filed with the City Planning Commission.

CRA and MTP filed the MTP Designated Building Site Application with the City Planning Commission. In the application, they requested that the five Library Square parcels be designated as a building site under Ordinance No. 159802. The application described the development that would be permitted on

---

[7] That covenant and related covenants executed by MTP's successors and a related entity against the four other Library Square parcels are discussed below pp. 12-13.

the five parcels, and the Library Tower and Grand Place Tower variations that CRA would issue to MTP.  This development to be permitted was the same as shown in Table 1, supra p. 8.  The City Council approved the MTP application on August 13, 1985.

Ordinance No. 159802 required that the terms, limitations, and controls imposed by the City Council be placed into written agreements describing:  (1) The MTP Designated Building Site, (2) each of the individual parcels in the MTP Designated Building Site, (3) the buildable area and total permitted floor area of each parcel, and (4) any other matters which are desirable.  The ordinance required that those terms, limitations, and controls be designated as "covenants running with land" of each parcel.

In compliance with the ordinance, the City and the owners of the other four Library Square tract parcels executed and recorded against their parcel(s) an "Agreement Containing Covenants [Designated Building Site]".  Each covenant ran with the land and was binding on the owner and future owners until released by the City.  The covenants also provided as follows:

Table 2

| Covenant | Buildable Area Sq. Footage | | Maximum Permitted Net Floor Area |
|---|---|---|---|
| | Gross | Net | Sq. Footage |
| Library Tower Parcel | 69,277 | 55,600 | 1,300,000 |
| Garage Plaza Parcel | 75,000 | 75,000 | 6,000[1] |
| Grand Place Tower Parcel | 60,550 | 52,500 | 1,200,000 |
| One Bunker Hill Parcel | 30,384 | 30,400 | 240,000 |
| Central Library Parcel | 147,211 | 147,211 | 361,000 |

[1]With a building footprint up to 3,000 square feet.

E.    The Library Tower and Grand Place Tower Variations

MTP's obligations under the OPA were conditioned on issuance by CRA to MTP of variations under section 437 of the CBD Plan permitting the Library Tower and Grand Place Tower buildings to be built.  Section 437 of the CBD Plan provides that no variation issued by CRA is effective until any necessary zoning changes have been obtained.  The Library Tower and Grand Place Tower variations issued by CRA to MTP were not effective until the MTP Designated Building Site Application had been approved by the City.

On June 17, 1985, CRA adopted resolution No. 3548 to permit MTP to exceed FAR limitations in developing the Library Tower building, the Garage Plaza underground parking garage, and the garden plaza.  In conjunction with Ordinance No. 159802 and the MTP Designated Building Site, this variation increased allowable floor area by 413,900 square feet, permitted MTP to develop the Library Tower building with floor area up to 1.3 million square

feet, and restricted development by MTP of the Garage Plaza parcel to no more than 6,000 square feet of floor area. This variation would be voided if the OPA were terminated because MTP defaulted, but it would become unconditional and irrevocable if CRA certified to MTP that construction and development of the property had been completed satisfactorily.

CRA adopted a resolution permitting MTP to exceed FAR limitations for the Grand Place Tower building. This variation, in conjunction with Ordinance No. 159802 and the MTP Designated Building Site, increased the amount of allowed floor area by 885,000 square feet and permitted MTP to develop the Grand Place Tower building with floor area up to 1.2 million square feet. This variation was conditioned on MTP's paying all amounts it owed under the OPA, including $17,700,000 for Phase III. This variation would be nullified if the OPA were terminated by reason of default by MTP. It would become irrevocable if CRA certified to MTP that construction and development of the property had been completed satisfactorily.

Library Tower was placed in service in 1989. Grand Place Tower was placed in service in 1991. On March 18, 1998, CRA certified to MTP that all construction and development required by Phases I, II, and III of the OPA had been completed satisfactorily.

F.  Development Rights That MTP Obtained Under the OPA; Zoning
    Change Made for the Library Square Tract by Ordinance No.
    159802

As stated at paragraph D-1 above, MTP obtained certain development rights and/or land in exchange for MTP's specified payments to CRA.  Ordinance No. 159802 and the MTP Designated Building Site covering the Library Square tract represented an important part of those development rights that MTP obtained.

Without Ordinance No. 159802 and treatment of the Library Square tract as a Designated Building Site, CRA by variation alone could not have authorized MTP to build the Library Tower and Grand Place Tower buildings.  The effect of Ordinance 159802 and treatment of the Library Square Tract as a Designated Building Site was to make a zoning change which (1) treated the five Library Square parcels as one building site in order to comply with the City Charter's 13-to-1 building density limitation; and (2) provided a mechanism (i.e., the covenants running with the land) whereby the unused building density of the Central Library and Garage Plaza parcels could be used for the Library Tower and Grand Place Tower parcels.

The OPA and the Cooperation Agreement (1) included the City's agreement to the zoning change for the Library Square tract, and (2) provided for the sale by the City and CRA to MTP of the unused building density of the Central Library parcel.

As to the covenants running with the land which the City would record against the Central Library parcel, the Cooperation Agreement provided in pertinent part:

ARTICLE VIII

Covenants on Library Parcel

8.1 Covenant on Library Parcel Restricting Further Development. City agrees to record, among the land records of Los Angeles County, a covenant running with the land against Library Parcel limiting the Floor Area of the rehabilitated and expanded Central Library to 361,000 net useable square feet and prohibiting the development of any other Floor Area on such property. Said covenant shall be recorded concurrently with the close of Phase I Escrow and shall be for the benefit of City and Agency [CRA].

\* \* \* \* \* \* \*

8.3 Covenant on Library Parcel to Satisfy Designated Building Site Ordinance. City agrees to record, among the land records of Los Angeles County, a covenant running with the land against Library Parcel fulfilling the requirements of the Designated Building Site Application and Designated Building Site Ordinance defined herein. This covenant shall also be recorded concurrently with the close of Phase I Escrow and shall be for the benefit of City.

The draft Cooperation Agreement attached to the OPA contained identical provisions concerning covenants on the Central Library parcel.

G. Library Square and Fifth & Grand Tax Returns and Respondent's FPAA Determinations

Library Square allocated $14,249,918 of the $33,192,567 that MTP paid to CRA to land which MTP acquired from CRA. Library Square included the remaining $18,942,649 that MTP paid

for development rights in the depreciable basis of Library
Tower. Library Square did not deduct any of the $14,249,918 as
depreciation, and that amount is not an issue in these cases.
Library Square included the remaining $18,942,649 in the
depreciable basis of Library Tower and deducted an amount based
thereon in its tax returns for 1989-96.

Fifth & Grand included the $17,700,000 that MTP paid to CRA
for development rights in connection with Phase III of the OPA
in the depreciable basis of Grand Place Tower and deducted
amounts based thereon in its tax returns for 1991-92 and 1994-
96.

In Notices of Final Partnership Administrative Adjustments
(FPAA) issued to Library Square for 1989-96, and to Fifth &
Grand for 1991-92 and 1994-96, respondent disallowed the
depreciation Library Square and Fifth & Grand had claimed with
respect to costs incurred to acquire development rights.

OPINION

A. The Parties' Arguments

1. Petitioners' Arguments

Petitioners contend that (a) all of the development costs
in issue were incurred to acquire the variations that allowed
Library Square and Fifth & Grand to construct Library Tower and
Grand Place Tower; (b) Ordinance No. 159802 and the MTP
Designated Building Site added nothing to the rights that

Library Square and Fifth & Grand obtained under the variations; (c) the Library Tower and the Grand Place Tower variations provided only a one-time right to build Library Tower, the Garage Plaza's underground parking garage, and the Grand Place Tower; (d) the OPA and the Cooperation Agreement gave no meaningful rights to Library Square and Fifth & Grand extending beyond the respective lives of the Library Tower and Grand Place Tower buildings; and (e) Library Square and Fifth & Grand may depreciate those development costs over a 31.5-year recovery period.

2. Respondent's Arguments

Respondent contends that none of the costs that Library Square and Fifth & Grand incurred for development rights are depreciable. Respondent asserts: (1) Library Square and Fifth & Grand acquired building density rights or TFAR from other parcels; (2) their development rights cannot be separated from their Library Tower parcel or Grand Place Tower parcel and are interests in land; (3) the MTP Designated Building Site and the Library Tower and Grand Place Tower variations are akin to a zoning change, and, thus, are not depreciable; and (4) the development rights do not have a limited useful life.

B. Applicable Legal Standards

Section 167 generally allows as a depreciation deduction a reasonable allowance for exhaustion and wear and tear of

property used in business or property held for the production of income. However, land generally is not depreciable because it has no limited useful life and is not subject to exhaustion or obsolescence. Bender v. United States, 383 F.2d 656, 659 (6th Cir. 1967); sec. 1.167(a)-2, Income Tax Regs.

In addition, a taxpayer's cost of obtaining a zoning change for that taxpayer's land must be capitalized and is not depreciable if the benefits resulting from the zoning change are indefinite and undeterminable in duration. Galt v. Commissioner, 19 T.C. 892, 910 (1953), revd. in part and affd. in part on other issues 216 F.2d 41 (7th Cir. 1954); see Oliver v. Commissioner, T.C. Memo. 1976-145, affd. 553 F.2d 560 (8th Cir. 1977); Ackerman Buick, Inc. v. Commissioner, T.C. Memo. 1973-224.

C.    The Expert Testimony

Petitioners and respondent offered expert testimony. The reports prepared by petitioners' expert and respondent's expert were admitted in evidence as their direct testimony. We may reject the testimony of an expert witness, in whole or in part, in the exercise of our sound judgment. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); In re Estate of Williams, 256 F.2d 217, 219 (9th Cir. 1958), affg. T.C. Memo. 1956-239.

1.   <u>Petitioners' Expert</u>

Petitioners' expert was an attorney with extensive experience in representing clients engaged in real estate development projects, including private developers, redevelopment agencies, cities, and other public and private entities.  He said that a variation provides project-specific relief to a property owner from an otherwise applicable zoning restriction, and that a variation covers only the particular structure to be built.  He opined that a variation gives a property owner no right to construct a replacement building on that property.

Petitioners' expert opined that Library Square and Fifth & Grand obtained no benefits for the Library Tower and Grand Place Tower parcels other than the Library Tower and Grand Place Tower variations.  In contrast, he said that the covenants the City recorded against the Central Library parcel would remain in effect until released by the City and/or CRA.

Enactment by the City of Ordinance No. 159802 allowed the MTP Designated Building Site to be established in order to treat the five Library Square tract parcels as a single building site to meet the City Charter's 13-to-1 building density limitation. Petitioners' expert said that ordinance merely allowed CRA to find and negotiate an agreement with a private developer wanting

the relief that CRA would grant pursuant to the Library Tower and Grand Place Tower variations.

2.   Respondent's Expert

Respondent's expert is an attorney with extensive experience representing developers and landowners in constructing, financing, buying, and selling commercial and residential real estate, and in obtaining regulatory approval for real estate development.  He formerly worked in the Office of the City Attorney for the City and County of San Francisco. His duties there included advising the San Francisco Zoning Administrator on the granting of variations and overseeing San Francisco's Transfer of Development Rights program and negotiations of approvals for developers of large developments.

Respondent's expert stated that, if the Library Tower or Grand Place Tower were to be replaced, the property owner would be required to obtain a second variation in order to construct another building of the same density on the property.  He opined that the existence of the prior Library Tower and Grand Place Tower variations, the MTP Designated Building Site, and the restrictive covenants covering the Library Square Tract parcels would put the owner in a stronger position to obtain a second variation.  He opined that there would be no certainty that a second variation permitting a building of similar density would

be granted, but the owner could reasonably expect to be successful.

Respondent's expert disagreed with petitioners' expert's opinion that the Library Tower and Grand Place Tower variations rendered Ordinance No. 159802 and the MTP Designated Building Site unimportant.  He said those variations could not have been granted without Ordinance No. 159802 and the MTP Designated Building Site.

3.  Analysis

Contrary in part to the arguments of both parties, we conclude that the costs of obtaining the development rights in issue for Library Square and Fifth & Grand are partly depreciable.

a.  The Variations

Both parties' experts agreed that the Library Tower and Grand Place Tower variations would not survive the buildings for which those variations were granted.  If Library Tower or Grand Place Tower were to be replaced, the owner could not build another building exceeding the then-zoning building density limit for the property without obtaining a second variation.

Respondent contends that the terms of the variations support respondent's position.  We disagree.  The variations by their terms do not automatically apply to buildings other than those already placed in service.

The variations, by their terms, become irrevocable when the CRA certifies that construction and development of the property has been completed satisfactorily.  Respondent argues that this means that the variations conveyed a benefit to the landowner that is either perpetual or indefinite.  We disagree.  Both parties' experts testified to the contrary and said essentially that the variations do not automatically apply to buildings built after those already placed in service.  Their opinion is shared by Murray Kane, who drafted the variations for CRA.  When asked at trial whether the variations would endure forever, he said: "No, it doesn't speak to perpetuity.  It merely means that the redevelopment agency could not revoke the permission to build this building that was granted by this variation."

We conclude: (1) The costs of the Library Tower and Grand Place Tower variations are allocable to the building that was the subject of that variation (i.e., Library Tower or Grand Place Tower) and not to the land; (2) those variations have limited useful lives equal to the depreciable lives of Library Tower and Grand Place Tower; and (3) the costs of obtaining those variations are includable in the depreciable basis of Library Tower and Grand Place Tower.

> b.    Ordinance No. 159802 and MTP Designated Building Site

We disagree with petitioners' contention that the variations were the only meaningful benefits that Library Square

and Fifth & Grand obtained.  Without Ordinance No. 159802 and the MTP Designated Building Site, CRA could not have permitted by variation MTP's development of Library Tower and Grand Place Tower.  This ordinance and the MTP Designated Building Site effected a zoning change which (1) treated the five Library Square tract parcels as a single building site in order to comply with the City Charter's 13-to-1 building density limitation,, and (2) provided a mechanism whereby the unused building density of the Central Library and Garage Plaza parcels could be used for the Library Tower and Grand Place Tower parcels.

Unlike the Library Tower and Grand Place Tower variations, the zoning change made by Ordinance No. 159802 and the MTP Designated Building Site produced benefits of an indefinite and undeterminable duration.  Neither Ordinance No. 159802 nor the other operative documents for the MTP Designated Building Site set a time limit on the duration of the MTP Designated Building Site.  Ordinance No. 159802 provides only that the terms, limitations, and controls with respect to a designated building site established pursuant to that ordinance, as determined by the City Council, be placed into covenants running with the land recorded against each parcel within such designated building site.  The covenants running with the land that the City, Library Square, Fifth & Grand, and another entity related to MTP

recorded against their Library Square tract parcels to fulfill the requirements of the MTP Designated Building Site Application continue in effect until released by the City.

Although the City could repeal Ordinance No. 159802 and the MTP Designated Building Site, that possibility exists for any zoning change. A property owner has no vested right to have its property's current zoning continued; a local governmental or zoning authority, in the exercise of its police power, may later revise the property's zoning. See, e.g., Avco Cmty. Developers, Inc. v. S. Coast Regl. Commn., 553 P.2d 546 (Cal. 1976) (a governmental authority may not contract away its right to exercise its police power in the future).

We conclude that the zoning change made by Ordinance No. 159802 and the MTP Designated Site produced benefits of an indefinite and undeterminable duration for the Library Tower and Grand Place Tower parcels and/or the owners of those parcels. The cost of obtaining this zoning change is thus not depreciable by either Library Square or Fifth & Grand, but it must instead be capitalized and allocated to the Library Tower parcel or Grand Place Tower parcel. Galt v. Commissioner, 19 T.C. at 910; cf. Chevy Chase Land Co. v. Commissioner, 72 T.C. 481, 487-489 (1979) (the costs incurred by the taxpayer for an unsuccessful rezoning effort were deductible as an abandonment loss). Our case here is like Galt and is distinguishable from Chevy Chase

- 27 -

Land Co.  In Galt, the taxpayer wanted to lease his fairgrounds for harness racing, and he obtained a zoning change for the property to permit parking and the sale of beverages thereon. The taxpayer in Galt then entered into a 20-year lease agreement for his property and depreciated the cost of obtaining the zoning change over the 20-year life of the lease.  The Tax Court noted that the zoning change affected the property beyond the 20-year term of the lease and held that the cost of the zoning change was not depreciable because the zoning change produced benefits of an indefinite and undeterminable duration.  Galt v. Commissioner, supra at 909-910.  In contrast, in Chevy Chase Land Co., the taxpayer unsuccessfully sought to have its land rezoned in order to construct a Bloomingdale's store.  The taxpayer in Chevy Chase Land Co. had previously reached an agreement to lease the land to Federated Dept. Stores (the owner of the Bloomingdale's chain).  This lease agreement was contingent upon a favorable ruling on the rezoning application for the land.  After the rezoning application was denied, Federated Dept. Stores terminated the lease agreement for the land.  The Tax Court allowed the taxpayer to deduct the costs of the rezoning effort as an abandonment loss after Bloomingdale's transaction terminated since the Bloomingdale's lease transaction was contingent upon obtaining the rezoning.  See Chevy Chase Land Co. v. Commissioner, supra at 482-488.  The Tax

Court in <u>Chevy Chase Land Co.</u> distinguished <u>Galt</u>. See <u>id.</u> at 487-488. Unlike <u>Chevy Chase Land Co.</u>, in our case MTP obtained the necessary zoning change for the Library Square tract and proceeded with the Library Square project and the building of Library Tower and Grand Place Tower.

        c.    <u>Allocation</u>

As previously stated, the costs that MTP and its successors incurred to obtain the Library Tower and Grand Place Tower variations are includable in the depreciable bases of those buildings and are depreciable by Library Square and by Fifth & Grand, but neither Library Square nor Fifth & Grand may depreciate the costs incurred to obtain the zoning change.

The record does not show the cost of obtaining the zoning change separate from the variations. We suspect those separate costs may not be readily available. Because of the difficulty of separately accounting for those costs, we believe this is an appropriate situation for the Court to identify a reasonable method to make an allocation. See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 544 (2d Cir. 1930). We conclude that the allocation between the zoning change and the variations should be based upon the relative increase in each property's buildable net floor area square footage attributable to the zoning change as opposed to the variations.

The CBD and Bunker Hill Redevelop. Plans generally permitted a FAR of 6 to 1 with respect to the five Library Square tract parcels. The zoning change, among other things, established a mechanism (i.e., the covenants running with the land recorded by each Library Square tract owner against its parcel) whereby the unused building density of the Central Library and Garage Plaza parcels was used for the Library Tower and Grand Place Tower parcels. The record reflects that, through this zoning change (i.e., with Ordinance No. 159802 and the MTP Designated Building Site in place), MTP and its successors obtained an additional 1,557,266 square feet of floor area for the Library Tower and Grand Place Tower parcels. The 1,557,266 square footage of floor area is calculated as follows:

| Parcel | Permitted net floor area sq. footage with zoning change |
|---|---|
| Library Tower | X (unknown) |
| Garage Plaza | 6,000 |
| Grand Place Tower | Y (unknown) |
| One Bunker Hill | 240,000 |
| Central Library | 361,000 |
| Total: | [1]2,164,266 |

Overall FAR: [2]6.0

[1] The total of the amounts for Library Tower and Grand Place Tower account for the difference between the numbers appearing in this chart and 2,164,266. The net buildable area of the five parcels, multiplied by six. 360,711 times 6 equals 2,164,266. See Table 1, supra p. 8.

[2] Computed on the basis of net buildable square footage as the CBD Plan provides.

$$2,164,266 - 6,000 - 240,000 - 361,000 = 1,557,266$$

This 1,557,266 of additional net floor area square footage (attributable to the zoning change) must be allocated between the Library Tower and the Grand Place Tower parcels. We conclude that that allocation may be based on the relative total net floor area of the Library Tower building and the Grand Place Tower building. We further conclude that the zoning change produced (1) an increase of 809,778 of net floor area square footage for the Library Tower parcel, and (2) an increase of 747,488 of net floor area square footage for the Grand Place Tower parcel. These increases in net floor area square footage were calculated as follows:

| Building | Planned total net floor area sq. footage | Allocation of additional net floor area sq. footage produced from zoning change |
|---|---|---|
| Library Tower | 1,300,000 | [1]809,778 |
| Grand Place Tower | 1,200,000 | [2]747,488 |

[1] $1,557,266 \times \dfrac{1,300,000}{2,500,000} = 809,778$ (rounded).

[2] $1,557,266 \times \dfrac{1,200,000}{2,500,000} = 747,488$ (rounded).

Thus, MTP and its successor Library Square obtained under their development rights pursuant to phases I and II of the OPA an increase of 809,778[8] square feet in buildable net floor area for the Library Tower parcel attributable to the zoning change.

---

[8] Square footage is sometimes rounded in this opinion.

We also find that MTP and Library Square obtained under their development rights pursuant to phases I and II of the OPA an increase of 490,222 square feet (i.e., 1,300,000 minus 809,778) in buildable net floor area for the Library Tower building attributable to the Library Tower variation.

Similarly, we find that MTP and its successor Fifth & Grand obtained under their development rights pursuant to phase III of the OPA an increase of 747,488 square feet in buildable net floor area for the Grand Place Tower parcel attributable to the zoning change. We also find that MTP and Fifth & Grand obtained under their development rights pursuant to phase III of the OPA, an increase of 452,512 square feet (i.e., 1,200,000 minus 747,488) in buildable net floor area for the Grand Place Tower building attributable to the Grand Place Tower variation.

We further find as to the $18,942,649 that MTP paid to obtain those development rights pursuant to phases I and II of the OPA that: (1) $11,799,493 was incurred to obtain the zoning change,[9] and (2) the remaining $7,143,156 was incurred to obtain the Library Tower variation.[10] Similarly, we find as to the $17,700,000 that MTP paid to obtain those development rights pursuant to phase III of the OPA that: (1) $11,025,448 was

---

[9] $18,942,649 x $\dfrac{809,778 \text{ sq. ft.}}{1,300,000 \text{ sq. ft.}}$ = $11,799,493.

[10] $18,942,649 x $\dfrac{490,222 \text{ sq. ft.}}{1,300,000 \text{ sq. ft.}}$ = $7,143,156.

incurred to obtain the zoning change,[11] and (2) the remaining $6,674,552 was incurred to obtain the Grand Tower variation.[12]

We hold that Library Square may depreciate and include in the depreciable basis of Library Tower the $7,143,156 that we have determined is attributable to obtaining the Library Tower variation. We further hold that Library Tower may not depreciate the $11,799,493 that we have determined is attributable to obtaining the zoning change, as that zoning change produced benefits of an indefinite and undeterminable duration with respect to the Library Tower parcel land. Galt v. Commissioner, 19 T.C. at 910.

We hold that Fifth & Grand may depreciate and include in the depreciable basis of Grand Place Tower the $6,674,552 that we have determined is attributable to obtaining the Grand Place Tower variation. We further hold that Fifth & Grand may not depreciate the $11,025,448 that we have determined is attributable to obtaining the zoning change because the zoning change produced benefits of an indefinite and undeterminable

---

[11] $17,700,000 x $\dfrac{747,488 \text{ sq. ft.}}{1,200,000 \text{ sq. ft.}}$ = $11,025,448.

[12] $17,700,000 x $\dfrac{452,512 \text{ sq. ft.}}{1,200,000 \text{ sq. ft.}}$ = $6,674,552.

duration with respect to the Grand Place Tower parcel land.  <u>Id.</u>

To reflect the foregoing and concessions by the parties,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>